## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**DEMOND COOK**                                          **CIVIL ACTION**

**VERSUS**                                                    **NO.  14-48**

**N. BURL CAIN, WARDEN**                       **SECTION "JTM"(JW)**

### REPORT AND RECOMMENDATION

This matter was filed in the United States District Court for the Middle District of Louisiana.  After all judges of that court recused themselves, the case was reassigned to this court, Record Doc. Nos. 5, 6, and referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

I.     STATE COURT PROCEDURAL BACKGROUND

The petitioner, Demond Cook, is incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]  Cook was charged by bill of information in East Baton Rouge Parish with two counts of armed robbery, two counts of second degree kidnapping and one count of aggravated kidnapping.[3]  The aggravated kidnapping charge was eventually dismissed by the State.[4]  The Louisiana First Circuit Court of Appeal summarized the facts determined at trial in relevant part as follows:

> On November 26, 2008, as Margaret Sibley and Yolanda Brooks were preparing for closing at the Family Dollar store on Florida Boulevard, Brooks walked outside to return a shopping cart to its designated area. As she exited the store, a black male wearing a black hooded sweatshirt, blue jeans, black tennis shoes, a blue bandana covering the lower portion of his face, and a pair of black gloves, approached. The man pointed a handgun directly at Brooks's face and forced her back into the store. Frightened, Brooks screamed. Sibley, the store manager, who had been counting money in her cash drawer, immediately looked toward the door and observed the gunman holding Brooks at gunpoint. The gunman demanded money. He continued to hold Brooks, who was obviously pregnant, at gunpoint (including sometimes pointing the gun directly toward her stomach), while Sibley retrieved the money from the cash register and store safe. After receiving the money, the gunman instructed Sibley to get her keys. Sibley complied. The gunman forced the two women into Sibley's vehicle and told Sibley where to drive. The gunman exited the vehicle on Madison Avenue in Baton Rouge. Sibley immediately contacted the police.
> The second incident occurred near closing time on December 3, 2008, at Money Mart, a check-cashing establishment on Airline Highway in Baton

---

[2]Rec. Doc. No. 1.

[3]St. Rec. Doc. No. 1; State v. Cook, No. 2011-KA-0148, 2011 WL 4572784, at *1 (La. App. 1st Cir. Sept. 14, 2011), rev'd in part, 82 So. 3d 1239 (La. 2012).

[4]Id.

Rouge.  Brent Beling, an employee with Dollar Financial Group, a Phoenix, Arizona-based company (doing business locally as "Money Mart") was walking to his car after conducting an audit at the Money Mart store when he was approached by a black male with a handgun. The gunman was wearing a dark sweatshirt with a hood covering his head, a dark pair of slacks, and a blue bandana partially covering his face. The gunman pointed the gun at Beling and told him, "[g]ive me what you have."  Beling gave the gunman his briefcase. The gunman then grabbed Beling by the collar and told him, "[w]e're going to go back in there." He then forced Beling back into the store's lobby.

The lobby of the Money Mart store was separated from the remaining area of the store by a wall with a glass window and a locked door. From the area behind the glass window, store clerk Shondrika Mayo observed the gunman holding Beling at gunpoint. The gunman demanded that Beling open the door leading to the adjoining business area of the store. Beling told the gunman he did not have keys to open the door. The gunman then yelled at Mayo, through the window, demanding that she open the door and threatening to shoot Beling if Mayo did not open the door. Having been trained to never open the door in this type of situation, Mayo refused. Instead, Mayo went into the back area of the store where the store manager, Johanna Graham, was located and advised that there was a robbery in progress. Graham called 911.

The gunman again demanded that Beling open the door. Beling emptied his pockets, gave the gunman the keys to the rental car he was driving, and assured him that those were the only keys in his possession. The gunman grabbed the keys and attempted to exit the store.  However, the exit door was now locked. The gunman forcibly opened the door and fled with Beling's rental car keys and briefcase.

Approximately two or three minutes after the robbery call was made, Corporal James Cutrer, of the Baton Rouge City Police Department, arrived in the area near the Money Mart store to investigate the robbery complaint. Corporal Cutrer observed a black male, wearing black pants and a white shirt walking in a vacant lot near Money Mart. When Corporal Cutrer illuminated the area with his spotlight, the man, subsequently identified as the defendant, started running.  He was also clutching his waist as he ran.  Corporal Cutrer followed in his vehicle, but eventually lost sight as the defendant jumped a fence.  Corporal Cutrer drove to a nearby area and exited his vehicle.  He again observed the defendant running. Despite verbal commands to stop, the defendant continued to run. Corporal Cutrer continued to pursue the defendant on foot.

The defendant was eventually found hiding under a vehicle at a residence in the area. A blue bandana was also found under the vehicle. The keys to Beling's rental vehicle were recovered from the pocket of the pants the

defendant was wearing. Approximately five to ten feet from the vehicle, a black handgun was found behind a tire. A black backpack was later found in the vacant lot where the defendant was initially spotted by Corporal Cutrer. The contents of the backpack included a black hooded sweatshirt, a stocking skull cap, two screwdrivers, a chisel, and a pair of gloves. Beling's computer and briefcase were also found in the area through which the officers believed the defendant ran.

Beling and Mayo were separately transported to the scene where the defendant was being detained. Both individuals positively identified the defendant as the gunman.

Later, when Detective Carl Mayo, of the Baton Rouge Police Department, learned of the details of the Money Mart robbery, he compiled a six-person photo lineup with the defendant's picture and presented it to Brooks and Sibley for possible identification in connection with the Family Dollar robbery, which had occurred approximately one week earlier. Brooks identified the defendant as the individual who committed the robbery at Family Dollar. Sibley could not identify the defendant with absolute certainty. She chose the defendant's photograph and the photograph of one other individual in the lineup as having eyes like the gunman. However, Brooks stated she was absolutely certain in her identification of the defendant. She also identified the defendant in open court as the person who held her at gunpoint inside the Family Dollar store.

State v. Cook, 90 So.3d 542 (La. App. 1st Cir. 2011) (Table); State v. Cook, No. 2011-KA-0148, 2011 WL 4572784, at *1-*3 (La. App. 1st Cir. Sep. 14, 2011).

After waiving his right to a jury trial, Cook was tried on September 9, 2010, before a judge and found guilty as charged of two counts of armed robbery and two counts of second degree kidnapping.[5] He was eventually sentenced as a fourth felony offender to serve concurrent sentences of life in prison at hard labor on each count.

---

[5] Rec. Doc. No. 1: State v. Cook, No. 2011-KA-0148, 2011 WL 4572784, at *1 (La. App. 1st Cir. Sept. 14, 2011).

4

On direct appeal to the Louisiana First Circuit, Cook's appointed counsel asserted that the state trial court erred by permitting Cook to represent himself without first advising him of the disadvantages of self-representation and by allowing him to enter a guilty plea to the multiple offender bill without first arraigning him or advising him of his rights.[6] The court affirmed the convictions on September 11, 2012, finding no merit in the first claim. However, the court found that Cook's second claim had merit and vacated his habitual offender adjudication and sentence. The First Circuit remanded the matter to the trial court for re-sentencing.

On March 23, 2012, on review of the State's related writ application, the Louisiana Supreme Court reversed the First Circuit on the sentencing issue and reinstated Cook's multiple offender sentence to life imprisonment.[7]

On September 12, 2012, Cook submitted an application to the state trial court for post-conviction relief, asserting the following grounds for relief:[8] (1) the State withheld evidence favorable to the defense; (2) a suggestive identification violated due process; (3) and (4) the prosecution engaged in misconduct when it presented perjured testimony and prevented the defense from presenting the correct portion of the dashboard camera video

---

[6]Id.

[7]State v. Cook, 82 So.3d 1239 (La. 2012); State v. Cook, 85 So. 3d 89 (La. 2012)(denying the separate writ application filed by Cook without stated reasons).

[8]St. Record Vol. 2 of 5, Uniform Application for Post-Conviction Relief, 9/12/12 (dated 2/15/12).

at trial; (5) there was insufficient evidence to convict him of the armed robbery of Beling; and (6) his due process and fair trial rights were violated when the prosecution interrupted the defense in reviewing the dashboard camera video.

The State responded that petitioner's claims "often repeat and/or overlap" and that it "diligently attempted to decipher what claims the petitioner attempted to make in his PCR application. . . ."[9]  The State consolidated and addressed Cook's claims as follows: (1) a Brady violation;[10] (2) a due process violation due to a suggestive identification process; (3) and (4) prosecutorial misconduct due to the presentation of perjured testimony by Detective Stubbs and by manipulating dashboard camera video evidence at trial; and (5) the evidence was insufficient to convict him of the Beling robbery.  Cook filed a traverse addressing his suggestive identification by Stubbs to Beling and the dashboard camera video.[11]  A Judicial Commissioner of the 19th Judicial District Court for East Baton Rouge Parish recommended that Cook's application for post-conviction relief be dismissed without a hearing on December 13, 2012.[12]  The trial court denied the

---

[9]St. Rec. Vol. 2 of 5, Answer to Post-Conviction Relief, p. 3, 11/15/12.

[10]In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

[11]St. Rec. Vol. 2 of 5, Motion to Traverse, dated 11/26/12.

[12]Rec. Doc. No. 28, Commissioner's Recommendation, 12/13/12.

application on February 2, 2013, for the reasons set forth in the Commissioner's recommendation.[13]

The Louisiana First Circuit denied Cook's subsequent writ application without stated reasons on May 20, 2013.[14]  The Louisiana Supreme Court denied Cook's related writ application without stated reasons on December 6, 2013.[15]

Petitioner submitted a successive application to the state court for post-conviction relief,[16] asserting the following grounds for relief: (1) his conviction and sentence were obtained through the use of evidence seized in violation of the Fourth Amendment and the Louisiana Constitution; (2) his conviction and sentence were obtained in violation of his Sixth Amendment right; and (3) his conviction and sentence were obtained in violation of his Fourth Amendment rights due to an invalid Terry stop.   The Commissioner recommended that the application for post-conviction relief be dismissed as successive pursuant to La. Code Crim. P. art. 930.4(E).[17]  The trial court dismissed the

---

[13] St. Rec. Vol. 2 of 5, Trial Court Order, 2/1/13.

[14] St. Rec. Vol. 2 of 5, 1st Cir. Order 2013-KW-0336, 5/20/13; 1st Cir. Writ Application, 2013-KW-0336.

[15] State ex rel. Cook. v. State, 129 So.3d 529 (La. 2013); St. Rec. Vol. 2 of 5, La. S. Ct. Order, 2013-KH-1365, 12/6/13; La. S. Ct. Writ Application, 13-KH-1365, 6/4/13.

[16] St. Rec. Vol. 2 of 5, Uniform Application for Post-Conviction Relief, 11/5/13 (dated 12/7/13).

[17] St. Rec. Vol. 2 of 5, Commissioner's Recommendation, 12/26/13.

application for the reasons set forth in the Commissioner's recommendation.[18]  The Louisiana First Circuit denied petitioner's subsequent writ application without stated reasons on June 2, 2014.[19]  The Louisiana Supreme Court denied petitioner's related writ application without stated reasons on April 24, 2015.[20]

## II.    FEDERAL HABEAS PETITION

On January 17, 2014, the Middle District clerk filed Cook's petition for federal habeas corpus relief in which he asserted nine challenges to his conviction.[21]  This court dismissed the petition for failure to exhaust all claims.  Record Doc. Nos. 8, 11.  Cook appealed to the United States Court of Appeals for the Fifth Circuit, which vacated the judgment and remanded the matter to this court solely for consideration of (A) the merits of petitioner's exhausted claims; specifically that (1) the State withheld evidence favorable to the defense; (2) an impermissibly suggestive identification process violated petitioner's due process rights; (3) the State engaged in misconduct by presenting false testimony by the detective; (4) there was insufficient evidence to support petitioner's conviction of robbing Brent Beling; and (5) the State's interference with the defense's

---

[18]St. Rec. Vol. 2 of 5, Trial Court Order, 2/9/14.

[19]St. Rec. Vol. 2 of 5, 1st Cir. Order, 2014-KW-0278, 6/2/14; 1st Circuit Writ Application, 2014-KW-0279 (dated 2/23/14).

[20]St. Rec. Vol. 2 of 5, La. S. Ct. Order, 2014-KH-1399, 4/24/15; La. S. Ct. Writ Application, 14-KH-1399, 6/30/14 (dated 6/26/14).

[21]Rec. Doc. No. 1, pp. 10-11.

review of a dashboard video camera recording violated petitioner's due process rights; and (B) whether Cook exhausted his claim that the State engaged in misconduct by presenting false testimony from witnesses Beling and Mayo.[22]

The State filed an answer and memorandum in opposition to Cook's petition.[23] The State concedes exhaustion of state court review on the five issues that were remanded on the merits, but argues that each of those claims lacks merit. The State contends that Cook's claim of prosecutorial misconduct by presenting false testimony from witnesses Beling and Mayo is not exhausted and is procedurally barred from review because Cook never presented the issue to the state courts. Alternatively, the State argues that this habeas claim is procedurally defaulted because Cook abandoned it.

III.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254. The AEDPA went into effect on April 24, 1996[24] and applies to habeas petitions filed after that date. Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)). The AEDPA therefore applies to

_____

[22]Cook v. Cain, 644 F. App'x 338 (5th Cir. 2016) (per curiam); Rec. Doc. No. 14, p. 4.

[23]Rec. Doc. Nos. 19, 23.

[24]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

Cook's petition, which, for reasons discussed below, is deemed filed in a federal court on January 17, 2014.[25]

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether petitioner's claims were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

Although not addressed by the State, I find that Cook's federal petition is timely. The State has asserted the defenses of failure to exhaust and procedural default as a basis for this court to dismiss petitioner's claims of prosecutorial misconduct based on the alleged perjury of Brent Beling and Shondrika Mayo.

IV.  EXHAUSTION OF STATE COURT REMEDIES

"A fundamental prerequisite to federal habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief." Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998) (citing Rose v. Lundy, 455 U.S. 509, 519-20

---

[25]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). The official stamp from the prison's Legal Programs Department appearing on Cook's cover letter reflects that Cook delivered the petition and accompanying documents to prison officials on January 17, 2014, the same day the documents were emailed to the clerk of court for filing. Rec. Doc. No. 3, p. 4.

(1982)); accord Preiser v. Rodriguez, 411 U.S. 475, 500 (1973); Nobles, 127 F.3d at 419.

"A federal habeas petition should be dismissed if state remedies have not been exhausted as to all of the federal court claims." Whitehead, 157 F.3d at 387 (citing 28 U.S.C. § 2254(b)(1)(A); Rose, 455 U.S. at 519-20) (emphasis added).

"The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." Id. (citing Picard v. Connor, 404 U.S. 270, 275-78 (1971)) (emphasis added). "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate review procedures. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); accord Duncan v. Walker, 533 U.S. 167, 177-79 (2001).

"A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." Whitehead, 157 F.3d at 387 (citing Picard, 404 U.S. at 275-78). "This requirement is not satisfied if the petitioner presents new legal theories or new factual claims in his federal application." (emphasis added) Id. (citing Nobles, 127 F.3d at 420). It is not enough for a petitioner to raise the claims in the lower state courts, if they were not also specifically presented to the Louisiana Supreme Court. See Baldwin v. Reese, 541 U.S. 27, 32 (2004) (a prisoner does not fairly present a claim to a state court if that court must read beyond a

11

petition, a brief, or similar papers to find the claim; mere reference to a lower court opinion is not sufficient).

To exhaust his claims in state court, Cook must fairly present the same claims and legal theories he urges in this federal court to the state courts through the Louisiana Supreme Court in a procedurally proper manner and must give the Louisiana Supreme Court an opportunity to address those claims. Petitioner asserted in his original application for post-conviction relief facts supporting a claim of prosecutorial misconduct as it related to Mayo's trial testimony. However, he did not include any such claim or facts related to Mayo in his writ application to the First Circuit. Because he did not present this claim to the First Circuit, it was not exhausted in a procedurally proper manner.

Petitioner's original application for post-conviction relief included a claim that the State knowingly presented perjured testimony by Beling at trial, although the Commissioner failed specifically to address the claim. Cook presented his prosecutorial misconduct claim based on the allegedly perjured testimony of Beling in his writ application to the First Circuit seeking review of the state trial court's denial of relief. He did not specifically identify his claims in the writ application presented to the Louisiana Supreme Court. Instead, he merely attached to his writ application the brief filed with the First Circuit.

Cook's failure to present his claim within the four corners of the writ application filed with the Louisiana Supreme Court does not appear to satisfy the exhaustion requirement of the Supreme Court in Baldwin.  See U.S. ex rel. Class v. Johnson, 2010 WL 3273538, *9 n. 2 (N.D. Ill. 8/18/10) (based upon Baldwin, the district court rejected petitioner's argument that the attachment of a lower court opinion to a writ application filed before the state supreme court was sufficient for exhaustion purposes).  However, in a case involving circumstances similar to those in this case, in which a brief to the lower court, as opposed to mere reference to an opinion, was attached to the supreme court application, the United States Court of Appeals for the Ninth Circuit found that state court remedies had been exhausted.

In Miller v. Quinn, 307 F. App'x. 96, 98 (9th Cir. 2009), in his brief to the Washington Supreme Court, petitioner "did not refer to the federal constitution, federal statutes or case law, or state case law analyzing federal constitutional issues."  However, petitioner had "cited such law quite extensively" in the petition filed with the Washington Court of Appeals.  The petitioner attached his lower court "petition and accompanying briefs as appendices to his motion for discretionary review to the Washington Supreme Court."  Id.  Thus, the Ninth Circuit found that the state supreme court filing satisfied the exhaustion requirement, distinguishing Baldwin because the petitioner actually attached his lower court pleadings to his state supreme court brief, whereas the petitioner in Baldwin had not.

> [T]he Supreme Court's concern in <u>Baldwin</u> was that state courts should not be forced to search for federal claims by reading through the whole of the lower court record. <u>See</u> 541 U.S. 27, 32, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (holding that a prisoner must present his or her claim in "a petition or a brief (<u>or a similar document</u>)" in order to exhaust), <u>rev'g</u>, 282 F.3d 1184 (9th Cir. 2002) [emphasis added]. In <u>Baldwin</u>, the lower court opinion was not filed with or attached to the petition filed in the state supreme court, unlike the . . . petitions here . . . . <u>See</u> <u>Reese v. Baldwin</u>, 282 F.3d at 1194-95 (T.G. Nelson J., dissenting) ("[T]he majority would . . . requir[e] [state supreme court justices] to root through the record for rare truffles of legal support."). Since Miller's [earlier] petition was filed as an appendix to his motion for discretionary review, Miller's federal claim was presented to the Washington Supreme Court in "<u>a similar document</u>" to his brief [emphasis added].

<u>Id</u>. <u>See</u> <u>Insyxiengmay v. Morgan</u>, 403 F.3d 657, 668 (9th Cir. 2005) (petitioner exhausted his state court remedies where his federal claims were raised in his petition filed with state appellate court, which was also attached as an appendix to his filing before the state supreme court).

On the other hand, the Tenth Circuit has held in <u>Wilkinson v. Timme</u>, 503 F. App'x 556, 560 (10th Cir. 2012), and <u>Jernigan v. Jaramillo</u>, 436 F. App'x 852, 856-57 (10th Cir. 2011), that petitioners cannot incorporate by reference claims or arguments that they had made in filings with the district court. <u>See</u> <u>Gaines-Tabb v. ICI Explosives, USA, Inc.</u>, 160 F.3d 613, 623-24 (10th Cir. 1998) (holding that allowing litigants to adopt district court filings would "unnecessarily complicate the task of an appellate judge"); <u>Argota v. Miller</u>, 424 Fed. Appx. 769, 771 (10th Cir. 2011) (declining to consider the petitioner's claims

that he sought to incorporate "merely by referencing the § 2254 habeas petition that he filed in the district court").

In light of this split and in the absence of binding Fifth Circuit precedent, I am not convinced that the <u>Baldwin</u> Court, by virtue of the language "or a similar document," intended that attached lower court pleadings specifically setting forth federal claims, with citation to federal case law, are insufficient to put a state supreme court on notice of said claims for exhaustion purposes. However, even if <u>Baldwin</u> could be read to indicate that Cook has not exhausted his state court remedies, because Cook's claims are clearly without merit, I will address them without requiring more specific exhaustion. 28 U.S.C. § 2254(b)(2).

V.    <u>STANDARDS OF MERIT REVIEW</u>

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings. <u>Nobles</u>, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), <u>cert. denied</u>, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and

the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"  Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir.), cert. denied, 531 U.S. 849 (2000)), aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001); Hill, 210 F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000); Penry v. Johnson, 532 U.S. 782, 792-93 (2001);  Hill, 210 F.3d at 485.  The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the

question." (citation omitted)  White v. Woodall, __ U.S. __, 134 S. Ct. 1697, 1706-07 (2014) (citing Harrington, 562 U.S. at 103, and Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)).  "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'"  White, 134 S. Ct. at 1706 (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)).

"'A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'"  Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone, 535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."  Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert. denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003).  The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.  Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25); Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

## VI.    WITHHELD BRADY EVIDENCE (CLAIM NO. 1)

Petitioner asserts that the State prevented him from playing the correct portions of the dashboard camera video during his cross-examination of witnesses at trial.  He claims

17

that the unshown portion of the dashboard camera video included exculpatory evidence; specifically, that Detective Stubbs suggested to Beling that petitioner was the man who committed the robbery. Petitioner contends that Stubbs said, "that's him. He just took the hood off." [26]

The Commissioner found that Cook had not met his burden of showing any evidence was withheld. The Commissioner noted that the defense had been provided the dashboard camera video months before trial and that petitioner was allowed to use the video during his cross-examination of Beling[27] This was the last reasoned opinion on the issue because the trial court adopted the Commissioner's reasoning and the First Circuit and Louisiana Supreme Court summarily denied Cook's subsequent writ applications. Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991) (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The

---

[26]Rec. Doc. 1, p. 12.

[27]Rec. Doc. 28, Commissioner's Recommendation, p. 6, 12/13/12.

duty to disclose this kind of evidence exists even though there has been no request by the defendant.  Strickler v. Greene, 527 U.S. 263, 280 (1999) (citing United States v. Agurs, 427 U.S. 97, 107 (1976)); Hall v. Thaler, 504 F. App'x 269, 273 (5th Cir. 2012) (citing Kyles v. Whitley, 514 U.S. 419, 433 (1995)).  The prosecution's duty to disclose includes both exculpatory and impeachment evidence.  Strickler, 527 U.S. at 280 (citing United States v. Bagley, 473 U.S. 667, 676 (1985)); United States v. Valas, 822 F.3d 228, 236-37 (5th Cir. 2016).

Brady claims involve "the discovery, after trial of information which had been known to the prosecution but unknown to the defense."  Lawrence v. Lensing, 42 F.3d 255, 257 (5th Cir. 1994) (quoting Agurs, 427 U.S. at 103); accord Reed v. Stephens, 739 F.3d 753, 783 (5th Cir. 2014).  Thus, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no Brady claim."  United States v. Brown, 628 F.2d 471, 473 (5th Cir. 1980); see Kutzner v. Cockrell, 303 F.3d 333, 336 (5th Cir. 2002) (holding that Brady does not require prosecutors to furnish a defendant with exculpatory evidence if that evidence is fully available to the defendant through an exercise of reasonable diligence); Rector v. Johnson, 120 F.3d 551, 558-59 (5th Cir. 1997) (holding that the State has no duty to lead the defense toward potentially exculpatory evidence if the defendant possesses the evidence or can discover it through due diligence).  Brady also does not place any burden upon the prosecution to conduct a

19

defendant's investigation or assist in the presentation of the defense's case.  United States v. Marrero, 904 F.2d 251, 261 (5th Cir. 1990) (citations omitted).  To prove a Brady violation, a defendant must establish that the evidence is favorable to the accused as exculpatory or impeachment, that the evidence was suppressed by the State, and that prejudice resulted from the non-disclosure.  Banks v. Dretke, 540 U.S. 668, 691 (2004) (citing Strickler, 527 U.S. at 281-82); Reed, 739 F.3d at 782.

Cook has not established that he was denied Brady material.  At a pretrial status conference held on September 7, 2010, defense counsel, in petitioner's presence, advised that petitioner had watched the dashboard camera video.[28]  At trial, the State disclosed that there were no other videos related to petitioner's arrest and audio recordings had been previously provided.[29]  Stand-by defense counsel explained that petitioner had not gotten to listen to any audio.[30]  The court allowed Cook to listen to the audio during a recess.[31]  Petitioner utilized the dashboard camera video during his cross-examination of Beling and Mayo.[32]  The State then recalled Detective Higginbotham, who explained that petitioner had questioned Beling about the incorrect portion of the video; specifically, petitioner had

---

[28]St. Rec. Vol. 1 of 5, Status Conference Transcript, p. 3, 9/7/2010.

[29]St. Rec. Vol. 5 of 5, Trial Transcript, pp. 10-11.

[30]Id., p. 11.

[31]Id., pp. 12, 38-39.

[32]Id., pp. 57-59, 91-92, 96-97, 99.

shown Beling the portion of video that was taken when Mayo came to the scene to identify petitioner.[33] When Higginbotham's direct examination concluded, the trial court permitted petitioner to listen to the audio again and, after doing so, petitioner determined he had no questions for Higginbotham.[34] At no point did petitioner seek to recall Beling or Mayo to question them about an alternate portion of the video. As petitioner reviewed both the audio and dashboard camera video evidence and was permitted to use the video evidence at trial, he has not shown that the State withheld evidence. The state's court decision was not contrary to or an unreasonable application of federal law.

VII.    <u>SUGGESTIVE IDENTIFICATION (CLAIM NO. 2.)</u>

     Petitioner asserts that, at the arrest scene, Detective Stubbs improperly suggested to Beling that petitioner was the robber. Cook claims that immediately before Beling's identification of Cook as the perpetrator, Stubbs twice stated, "That's him, he just took the hood off."[35] He claims that Stubbs's statement influenced Beling to identify petitioner as the person who robbed him.

     The Commissioner found petitioner's claim factually inaccurate because it was Beling who told Detective Higginbotham that petitioner was the person who had robbed

---

[33]<u>Id.</u>, pp. 105-106.

[34]<u>Id.</u>, p. 107.

[35]Rec. Doc. 1, p. 15.

him and that he had just taken off his hooded sweatshirt.[36]  The Commissioner further found that petitioner had not met his burden of showing the identification should have been suppressed because the identification was not unduly suggestive nor did it result in a substantial likelihood of misidentification.  He reasoned that Beling's identification was spontaneous and made without any suggestion from Higginbotham.  The Commissioner further reasoned that petitioner was apprehended shortly after the crime and Beling made an "on-spot " identification.[37]

The admissibility of an eyewitness's identification is a mixed question of law and fact.  Coleman v. Quarterman, 456 F.3d 537, 544 (5th Cir. 2006) (citing Livingston v. Johnson, 107 F.3d 297, 309 (5th Cir. 1997)); see also Sumner v. Mata, 455 U.S. 591, 597 (1982) ("[T]he ultimate question as to the constitutionality of the pretrial identification procedures . . . is a mixed question of law and fact . . . .").  The court must determine whether the state courts' denial of relief was contrary to or an unreasonable application of Supreme Court law.

In Simmons v. United States, 390 U.S. 377 (1968), the United States Supreme Court established a two-prong test for the exclusion of identifications based on impermissibly suggestive identification procedures that deny due process.  The first prong requires determination of whether the identification procedure was impermissibly

---

[36]Rec. Doc. 28, Commissioner's Recommendation, p. 8, 12/13/12.

[37]Id.

22

suggestive.  If it is not, the inquiry ends.  If it is, a separate inquiry must be made as to whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification.  Thus, "[i]f the identification procedure is not impermissibly suggestive, the inquiry ends."  Livingston, 107 F.3d at 309; Melancon v. Day, 979 F.2d 1534, 1992 WL 352618, at *1 (5th Cir. 1992) ("If the process was not suggestive, the inquiry ends.")  Pretrial screening for reliability is not required in cases where the police did not create a suggestive identification process.  Perry v. New Hampshire, __ U.S. __, 132 S. Ct. 716, 720-21 (2012).

In this case, testimony concerning the identification procedure was provided by the victim and an investigating officer at trial.[38]  Beling testified that, when he was brought to the scene of petitioner's arrest by Officer Douglas, he identified Cook as the person who robbed him.[39]  Beling testified that he personally may have made the statement "that's him.  He took the hood off," but did not recall hearing anyone else make the statement.[40]  Beling stated he was "absolutely not" coached or led to believe by anyone else petitioner was the robber.[41]

---

[38]St. Rec. Vol. 5 of 5, Trial Transcript, pp. 35-36, 47-66, 69-71, 73-77.

[39]St. Rec. Vol. 5 of 5, Trial Transcript p. 35.

[40]Id., pp. 47-49, 63-64.

[41]Id., p. 52.

Detective Higginbotham testified that he heard Beling tell Officer Douglas at the arrest scene, "That's the guy. Right there. He just took his jacket off."[42] When Higginbotham asked Beling whether he was sure of his identification, Beling told him, "I'm a hundred percent sure this is the guy. . . . The guy took his jacket off but that's the guy."[43] Higginbotham also confirmed that no one coached Beling.[44] Both Higginbotham and Stubbs testified that Stubbs was <u>not</u> present at the scene of petitioner's arrest.[45]

There is no evidence that any member of law enforcement made a suggestive statement to the victim to influence his identification. This court's inquiry ends because the first <u>Simmons</u> requirement is not met. On this issue, Cook has not established that the state court's finding that the identification was not unduly suggestive was contrary to Supreme Court precedent.

Nevertheless, the Supreme Court has stated that "[i]t is the likelihood of misidentification which violates a defendant's right to due process" and this is "the basis for the exclusion of evidence." <u>Neil v. Biggers</u>, 409 U.S. 188, 198 (1972). In this case, assuming, but certainly not finding, that some indication of suggestiveness existed, there

---

[42]<u>Id.</u>, p. 70.

[43]<u>Id.</u>

[44]<u>Id.</u>, p. 75.

[45]<u>Id.</u>, pp. 73 (Higginbotham), 138-139 (Stubbs).

was no substantial risk of misidentification, and federal habeas relief is wholly unwarranted.

In <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114-16 (1977), the United States Supreme Court reaffirmed several factors enumerated in <u>Biggers</u>, 409 U.S. at 199, that should be considered when reviewing the reliability of a witness's identification of a defendant. These include: (1) the opportunity of the witness to view the subject, (2) the witness's degree of attention, (3) the accuracy of the description, (4) the witness's level of certainty, (5) the elapsed time between the crime and the identification, and (6) the corrupting influence of the suggestive identification itself. <u>Herrera v. Collins</u>, 904 F.2d 944, 946 (5th Cir. 1990); <u>Passman v. Blackburn</u>, 652 F.2d 559, 570-71 (5th Cir. 1981).

At trial, Beling testified that he was able to look at the robber for five to ten minutes while in the excellent lighting of the lobby of the Money Mart.[46] He described the robber as wearing dark pants, a black hooded sweatshirt and a blue bandana. He told law enforcement that the robber had his briefcase with his computer and his rental car keys.[47] Beling testified that shortly after the robbery, he was taken to the scene where petitioner was in custody.[48] Although petitioner had taken off the bandana and hooded sweatshirt, Beling was able positively to identify him by his height, facial characteristics

---

[46]<u>Id.</u>, pp. 42-43,64.

[47]<u>Id.</u>, pp. 32,-34-35.

[48]<u>Id.</u>, p. 35.

and the shape of his head.[49]  At the time he identified petitioner, Beling was certain that Cook was the person who robbed him.[50]

Petitioner was found approximately seven blocks from the Money Mart soon after commission of the crime.[51]  A blue bandana was found under the car beneath which petitioner had been hiding and a cocked firearm was found five to ten feet away.[52] Beling's keys were found in petitioner's pocket.[53]  A black hooded sweatshirt and the briefcase with the computer were found along the route between the Money Mart and the location of petitioner's arrest.[54]

Each of the Manson factors supports a finding that Beling's pretrial identification was reliable, especially where Cook has made no showing of a corrupting influence on the part of the police.  Passman, 652 F.2d at 569-74) ("[O]ne-on-one show-ups of the accused separately to the bank tellers, immediately after he was arrested two hours after the robbery, did not taint the reliability of their in-court identification of the accused as one of the three robbers" when the tellers "had the opportunity and had exercised careful

---

[49]Id., pp. 35, 46, 50-51.

[50]Id., pp. 46, 64.

[51]Id., p. 113 (Cutrer).

[52]Id., pp. 128-129 (Camallo).

[53]Id., p. 124 (Averitt).

[54]Id., p. 115-118 (Cutrer).

and sustained attention upon the accused during the minutes of the robbery, . . . their post-robbery and pre-arrest descriptions of him were substantially accurate and pointed a reliable finger at the defendant even prior to the show-up identification, . . . their identifications were made immediately and without equivocation, and . . . [only two hours] had elapsed between the robbery and the show-ups."); Hannah v. Crosby, No. 804CV1072T24EAJ, 2005 WL 2346966, at *7 (M.D. Fla. Sept. 26, 2005) (citing Biggers, 409 U.S. at 198; United States v. Rice, 652 F.2d 521, 528 (5th Cir. 1981)) (Petitioner Hannah was convicted of carjacking and armed robbery. The court held that the one-to-one show-up was not unconstitutionally tainted when the victim, Blanton, was taken to a convenience store by police, who had told him only that his car had been located. Blanton identified petitioner at the store "perhaps 30 minutes after the crime and immediately upon Blanton's 'spotting' Hannah inside a convenience store, without any suggestion having been made to him beforehand that his assailant was present in the store; and Blanton was completely certain of his identification" because he "had gotten a good look at his assailant's face . . . . He was able to describe his assailant in fair detail, describing his hair . . . , the color of his clothing, as well as his race, and Hannah fit Blanton's description of his assailant."); see also United States v. Lyle, 112 F. App'x 324, 325 (5th Cir. 2004) (citing United States v. Craft, 691 F.2d 205, 205 (5th Cir. 1982)) (defendant failed to show that "one-man show-up identification affected any in-court identification," especially when evidence of petitioner's guilt of armed bank robbery was

overwhelming).   Cook has not established that the failure to exclude Beling's identification was a due process violation or contrary to Supreme Court law.  He is not entitled to relief on this issue.

## VIII.   PROSECUTORIAL MISCONDUCT  (CLAIMS NOS. 3, 5 & 6)

Petitioner's prosecutorial misconduct claim has two facets.  First, he alleges that the State presented perjured testimony to the trial judge.  Second, he alleges that the State manipulated the dashboard camera video presented during trial to prevent petitioner from presenting Stubbs's alleged identification of petitioner to Beling.

The Commissioner found that, other than petitioner's conclusory allegations, he had presented no evidence that the State had colluded with any witness or that it had any knowledge it was presenting perjured testimony.  The Commissioner also found that the State's case was not dependent on a single witness and that the State merely questioned Stubbs about the items retrieved from Beling's briefcase.  Regarding the video, the Commissioner found there was no evidence that the State altered it or interfered with use of it by the defense.  Rather, the trial court allowed petitioner to present any and all parts of the video.[55]

---

[55]Rec. Doc. 28, Commissioner's Recommendation, p. 8, 12/13/12.

28

A.    Perjured Testimony

A State denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected.  Giglio v. United States, 405 U.S. 150, 766 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959); Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996).  To obtain relief, the defendant must show that (1) the testimony was actually false, (2) the State knew it was false, and (3) the testimony was material.  Duncan v. Cockrell, 70 F. App'x 741, 744 (5th Cir. 2003); Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993).  False testimony is "material" only if there is any reasonable likelihood that it could have affected the verdict.  Duncan, 70 F. App'x at 744 (citing Nobles, 127 F.3d at 415).

A claim of prosecutorial misconduct, including use of perjured testimony, presents a mixed question of law and fact.  Brazley v. Cain, 35 F. App'x 390, 2002 WL 760471, at *4 n.4 (5th Cir. Apr. 16, 2002) (citing United States v. Emueqbunam, 268 F.3d 377, 403-04 (6th Cir. 2001)); Jones v. Gibson, 206 F.3d 946, 958 (10th Cir. 2000); United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997); United States v. Spillone, 879 F.2d 514, 520 (9th Cir. 1989)).  This court must determine whether the state courts' rulings were contrary to or an unreasonable application of federal law.  To the extent this

claim as it relates to the testimony of Beling and Mayo was not directly addressed by the state courts, it also is without merit under the applicable de novo standards of review.[56]

In this case, the State called Detective Stubbs to testify about the stolen items he returned to Beling. Stubbs testified that he returned to the victim the rental car keys, a briefcase, a computer, along with other miscellaneous items.[57] On cross-examination, Stubbs testified that he responded to the Money Mart and assisted with processing the scene.[58] Stubbs explained that he talked to the victims briefly before instructing Officer Douglas to transport the victims to the arrest scene for identification.[59]

Stubbs's testimony was not material to the State's case, and petitioner has <u>not</u> shown that any portion of Stubbs's testimony was false or perjured. While Cook asserts that Stubbs was at the scene of petitioner's arrest and suggested his identification as the robber to Beling, no evidence was presented supporting his contention. On the contrary,

---

[56]The AEDPA's deferential standard of review under Section 2254(d) and <u>Williams</u>, 529 U.S. at 362, applies only to claims adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d). The state court orders in this case do not appear to address Cook's perjury claim as it may be read to extend to Beling and Mayo's testimony at trial. With respect to claims that are not fully adjudicated on the merits in state court, the deferential AEDPA standards of review do not apply. <u>Cullen v. Pinholster</u>, 563 U.S. 170, 185-86 (2011); <u>Henderson v. Cockrell</u>, 333 F.3d 592, 597 (5th Cir. 2003). Instead, the federal courts review those claims under pre-AEDPA de novo standards of review. <u>Id</u>. at 598 (citing <u>Jones v. Jones</u>, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying de novo standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits)); <u>Carty v. Thaler</u>, 583 F.3d 244, 253 (5th Cir. 2009). Even under this standard, Cook's claim does not warrant federal habeas corpus relief.

[57]St. Rec. Vol 5 of 5, Trial Transcript, p. 137.

[58]<u>Id.</u>, p. 138.

[59]<u>Id.</u>, p. 139.

Detective Higginbotham, who petitioner does not contend committed perjury, testified that Stubbs was <u>not</u> at the scene of petitioner's arrest.[60]  There is no showing that the prosecutor knowingly or otherwise intended to promote false or perjured testimony.  The denial of relief on this issue was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law or otherwise a direct violation of federal law prohibiting the knowing presentation of perjured testimony at trial.

The State called Beling to testify at trial regarding his identification of Cook as the perpetrator who robbed him and held him at gunpoint at the Money Mart.  Beling testified that, within an hour of the robbery, Officer Douglas drove him to a field where they had a man in custody and asked him if the man was the robber.[61]  At that time, Beling positively identified Cook as the robber.  Beling testified that he was sure at the time he identified Cook that he was the perpetrator.[62]

While Cook tried to attack Beling's credibility, Beling denied being coached by law enforcement into believing Cook was the robber and repeatedly denied hearing

---

[60]<u>Id.</u>, pp. 68, 73.

[61]<u>Id.</u>, pp. 35, 64.

[62]<u>Id.</u>. pp. 35, 46.

anyone say, "that's him. He took the hood off."[63]  Beling said he may personally have made the statement.[64]  Beling denied that Stubbs brought him to the scene.[65]

The State called Shondrika Mayo to testify regarding the robbery she witnessed at the Money Mart and her identification of petitioner.  Mayo testified that Officer Douglas took her to the scene of petitioner's arrest and asked her if she was sure petitioner was the robber.[66]  Mayo testified she also spoke with Detective Higginbotham at the scene of petitioner's arrest.[67]  She explained that Higginbotham asked her if petitioner looked familiar, whether he was the robber and was she sure it was him.[68]  Mayo testified the robber "looked like Mr. Cook."[69]  She positively identified petitioner at trial as the robber.[70]

While Beling and Mayo's testimony was material to the State's case, Cook has not shown that any portion of their trial testimony was false or perjured. He offers no evidence to support his claim that these witnesses lied or that the State knew that they did

---

[63]Id., pp. 36, 47-49, 52, 63.

[64]Id., pp. 47-49.

[65]Id., p. 54.

[66]Id., pp. 90, 95-96.

[67]Id., p. 93.

[68]Id., p. 102.

[69]Id., p. 83.

[70]Id., p. 84.

not tell the truth.  The State, however, presented evidence in the form of Detective Higginbotham's testimony that it was Beling who made the statement when identifying Cook that he had taken the sweatshirt off.[71]  Higginbotham also confirmed that both Beling and Mayo identified the petitioner as the robber and that they were both certain of their identifications at the time they made them.[72]  Cook has failed to establish that the State violated his constitutional rights through the presentation of any false testimony from Beling and Mayo.  Cook is not entitled to federal habeas relief on this claim.

     B.   <u>Dashboard Camera Video</u>

To prevail on a claim of prosecutorial misconduct relating to suppressed evidence, petitioner must show that the prosecution withheld evidence favorable to the defense and that such evidence was material to petitioner's guilt.  <u>Banks</u>, 540 U.S. at 691 (citing <u>Strickler</u>, 527 U.S. at 281-82).  As explained above, Cook has not established that he was denied access to <u>Brady</u> material.  The record shows that petitioner was provided the dashboard camera video, he reviewed it before trial and he used the video during his cross-examination of witnesses at trial.  The trial court gave petitioner broad latitude in his use of the video and related questioning.  For these reasons, Cook has failed to establish that the state courts' denial of relief was contrary to, or an unreasonable application of, Supreme Court law.  He is not entitled to relief on this claim.

---

[71]<u>Id.</u>, p. 70.

[72]<u>Id.</u>, pp. 70-71.

IX.    <u>SUFFICIENCY OF THE EVIDENCE (CLAIM NO. 4)</u>

Cook alleges that the State failed to prove every element of the armed robbery charge related to Beling on December 3, 2008.  He claims the case against him was based on circumstantial evidence.  While Cook concedes he was found in possession of the bandana and the victim's keys and that the firearm was located in close proximity to him, he claims that he saw another man hiding the items and that he took them in hopes of selling them.  He claims his alibi was sufficient to establish reasonable doubt as to his guilt.

The Commissioner found that although petitioner claimed his conviction was based on circumstantial evidence, there was direct evidence from Beling that he had been robbed at gunpoint and the perpetrator had taken his keys and briefcase containing his computer.  The Commissioner reasoned that even if the case were based purely on circumstantial evidence, the result would have been the same because the alternative hypothesis was not reasonable since there was no reasonable explanation for how Beling's keys got in the petitioner's pocket.[73]

<u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), provides the appropriate United States Supreme Court standard for consideration of a claim of insufficient evidence.  Under <u>Jackson</u>, a federal habeas court addressing an insufficiency of the evidence claim must determine, after viewing the evidence in the light most favorable to the prosecution,

---

[73]Rec. Doc. 28, Commissioners Recommendation, pp. 10-11, 12/13/12.

whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.  Id. at 319; Williams v. Cain, 408 F. App'x 817, 821 (5th Cir. 2011); Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008).  Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law.  Perez, 529 F.3d at 594 (citing Jackson, 443 U. S. at 324 n. 16).

The court's consideration of the sufficiency of the evidence extends only to what was presented at trial.  See McDaniel v. Brown, 558 U.S. 120, 131, 134 (2010) (recognizing that a reviewing court must consider the trial evidence as a whole under Jackson); Johnson v. Cain, 347 F. App'x 89, 91 (5th Cir. 2009) (Jackson standard relies "upon the record evidence adduced at the trial") (quoting Jackson, 443 U.S. at 324).  Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury.  United States v. Young, 107 F. App'x 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993)); see Jackson, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").  All credibility choices and conflicting inferences must be resolved in favor of the verdict.  Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005).

A federal habeas court is <u>not</u> authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder.  <u>Weeks v. Scott</u>, 55 F.3d 1059, 1062 (5th Cir. 1995); <u>Alexander v. McCotter</u>, 775 F.2d 595, 598 (5th Cir. 1985).  In addition, "[t]he <u>Jackson</u> inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'"  <u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001) (quoting <u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993)).

A claim of insufficient evidence presents a mixed question of law and fact.  <u>Perez</u>, 529 F.3d at 594; <u>Maes v. Thomas</u>, 46 F.3d 979, 988 (10th Cir. 1995).  Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.[74]

In count four, Cook was charged and convicted of violation of La. Rev. Stat. § 14:64, which defines armed robbery as "the taking of anything of value belonging to

---

[74]"The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. Rev. Stat. § 15:438. However, on federal habeas corpus review, the court does not apply this state law "reasonable hypothesis" standard, and instead must apply <u>Jackson</u>. <u>See</u> <u>Gilley v. Collins</u>, 968 F.2d 465, 467 (5th Cir. 1992) (citing <u>Schrader v. Whitley</u>, 904 F.2d 282, 284 (5th Cir. 1990)). To the extent petitioner relies on Louisiana's circumstantial evidence rule itself, "[t]his is not a purely separate test from the <u>Jackson</u> standard to be applied instead of a sufficiency of the evidence test. . . . Ultimately, all evidence, both direct and circumstantial, must be sufficient under <u>Jackson</u> to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt." <u>State v. Porretto</u>, 468 So.2d 1142, 1146 (La. 1985); <u>accord</u> <u>State v. Williams</u>, 693 So.2d 204, 208 (La. App. 4th Cir. 1997). The reasonable hypothesis standard under state law is "just an evidentiary guide for the jury. If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails." <u>State v. Maxie</u>, 614 So.2d 1318, 1321 (La. App. 3d Cir. 1993); <u>accord</u> <u>State v. Williams</u>, 693 So.2d at 208. The appropriate standard for this court remains <u>Jackson</u> as applied under the parameters of the AEDPA.

another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La. Rev. Stat. § 14:64(A); State v. Thomas, 13 So. 3d 603, 606 (La. App. 5th Cir. 2009). To convict Cook of armed robbery, the State was required to prove beyond a reasonable doubt all elements of the statute. State v. Cotton, 646 So. 2d 1144, 1145-46 (La. App. 5th Cir. 2008). Under the Louisiana criminal code, anything of value "must be given the broadest possible construction, including any conceivable thing of the slightest value." La. Rev. Stat. § 14:2(A)(2). A dangerous weapon is defined broadly as "any gas, liquid, or other substance or instrumentality, which in the manner used, is calculated or likely to produce death or great bodily harm." Id. § 14:2(A)(3).

In addition to proving the elements of the crime, the State was also required to prove the defendant's identity as the perpetrator. State v. Fuller, 980 So. 2d 45, 46 (La. App. 5th Cir. 2009). In doing so, the "State is required to negate any reasonable probability of misidentification in order to carry its burden of proof." Id. (citing State v. Ingram, 888 So. 2d 923, 926 (La. App. 5th Cir. 2004)). Louisiana courts have held that a positive identification by one witness is enough to support a conviction of armed robbery. Id. Discrepancies in witness testimony go to credibility, which is a matter left to the judgment of the trier of fact, and an appellate court cannot reassess a credibility determination. State v. Thomas, 13 So. 3d 603, 607 (La. App. 5th Cir. 2008).

37

Where a perpetrator has created an "atmosphere of intimidation prompting the victim to reasonably react with fear for his life, an armed robbery conviction is justified." Cotton, 646 So. 2d at 1146.  Louisiana courts have held that a verbal threat is not necessary to prove force or intimidation.  State v. Billard, 852 So. 2d 1069, 1076 (La. App. 5th Cir. 2003) (citing State v. Wickem, 759 So. 2d 961, 965 (La. App. 5th Cir. 2000)).

During Cook's bench  trial, the trial judge heard testimony from the victim, a witness to the crime and and several law enforcement officers from the Baton Rouge Police Department concerning the robbery that took place at the Money Mart on December 3, 2008.[75]  The testimony established that around 6:20 p.m. on December 3, 2008, as Brent Beling was leaving the Money Mart, he was approached by a man carrying a gun and wearing dark slacks, a black hooded sweatshirt and a blue bandana over the lower portion of his face.[76]  The robber cocked the gun and told Beling to give him what he had.[77]  Beling gave the robber his briefcase.[78]  The robber grabbed Beling by the collar and walked him back to the door of the store.  The robber asked Beling how much money was in the store and Beling told him about $10,000.00.  After they walked back in the

---

[75]St. Rec. Vol. 5 of 5, Trial Transcript, pp. 21-139.

[76]Id. pp. 30-32, 43-44 (Beling).

[77]Id. p. 32.

[78]Id.

38

Money Mart, Beling explained that he did not have keys to open the interior door to the area where the safe was kept.[79]  The robber yelled at the two female employees to open the door, but they did as they had been trained earlier, ran to a secure area and called the police.  The robber yelled, "Come open the door.  I'm going to cop – cap this bitch.  I'm going to kill this nigger."[80]  Beling screamed hysterically for the employees to open the door.  He emptied his pockets and threw the keys to his rental car on the counter and told the robber it was all he had.  The robber grabbed the keys and ran out of the Money Mart carrying the briefcase.[81]

When law enforcement officers arrived, Beling described the robber and told them he should have the car keys.  Within the hour, Detective Douglas took Beling to an area where they had secured a person.[82]  Beling identified that person as the robber.  He made his identification based on the suspect's height, facial characteristics and shape of his head.[83]  Beling said he was "absolutely not" coached or compelled into identifying the suspect.[84]

---

[79]Id., p. 32.

[80]Id., p. 33.

[81]Id., p. 34.

[82]Id., p. 61.

[83]Id., p. 50-51.

[84]Id., p. 52.

Shondrika Mayo, a Money Mart employee, testified that seconds after Beling left, she heard banging on the door. She opened the door to the lobby when she saw Beling had a gun to his head.[85] The robber was wearing jeans, a dark hooded sweatshirt, and a blue bandana around his mouth and carrying a black gun.[86] He yelled at her to let him into the back area where the safe was located. Mayo went to the safe area and her manager, Johanna Graham, called the police.[87] When Detective Higginbothan took her to the scene of Cook's arrest, Mayo identified him as the robber.[88] Mayo felt "pretty sure" Cook was the robber because of his eyebrows, eyes and skin color.[89] Mayo identified Cook at trial as the robber and was still certain he was the robber.[90]

Corporal Cutrer testified that he responded to the area of the robbery within two to three minutes.[91] He saw a black male wearing black pants and a white shirt walking in a vacant lot about 400 yards from the Money Mart.[92] When Cutrer shined a spotlight

---

[85] Id., p. 81-82.

[86] Id., pp. 84-85.

[87] Id., pp. 82, 85.

[88] Id., p. 84, 96.

[89] Id., pp. 84, 100

[90] Id., pp. 83-84, 100, 103.

[91] Id., p. 108 .

[92] Id., pp. 108, 113.

on the suspect, the man began to flee, clutching something at his waist.[93]  Cutrer chased

the man and ultimately found him hiding under a vehicle about six or seven blocks from

the Money Mart.[94]  When Cook was removed from underneath the car, officers discovered

a blue bandana.[95]   After Cook was arrested, Cutrer recovered a backpack and a dark

hooded sweatshirt in the area from which he originally saw Cook run.[96]  He also found

a computer satchel and computer in the area between the Money Mart and where he

originally spotted Cook.[97]

Corporal Camallo also responded to the scene of Cook's arrest.  He observed Cook

under a vehicle.[98]  He deployed his taser and Cook was pulled out from under the car.  A

blue bandana was located under the vehicle.[99]  Camallo searched the area and found a

Ruger P-89 nine millimeter handgun with the hammer in the cocked position

approximately five to ten feet from the vehicle.[100]  Officer Averitt conducted a pat down

search of Cook when he was taken into custody.  Officer Averitt located keys in the front

---

[93]Id., pp. 109, 113.

[94]Id., p. 112-113.

[95]Id., p. 114.

[96]Id., pp. 115-116.

[97]Id., pp. 117-118.

[98]Id., pp. 127-128.

[99]Id., p. 128.

[100]Id., pp. 129-131.

right pocket of Cook's pants.[101]  Camallo took custody of the keys found on Cook and went to the Money Mart.  He found that the keys unlocked Beling's rental car.[102]

Detective Stubbs also responded to the Money Mart and assisted with processing the scene.[103]  He spoke with the victims briefly.  They described the robber as a black male wearing a dark hooded sweatshirt and a blue bandana.[104]  Stubbs instructed Officer Douglas to transport the victims to the scene of Cook's arrest for identification.  Stubbs stayed at the Money Mart.  Stubbs later released the car keys, briefcase, computer and other items contained in the briefcase back to Beling.[105]

Thus, the trial judge was presented with ample evidence that a man armed with a firearm and matching Cook's description, threatened to kill Beling and stole Beling's briefcase, computer and keys.  The victim and witness consistently testified that the robber was wearing a dark hooded sweatshirt and a blue bandana.  The State presented evidence that Cook was in the proximate area minutes after the robbery.  It further presented evidence that a blue bandana and firearm were found in close proximity to Cook when he was arrested and that Beling's keys were found in Cook's pocket.  The

---

[101]Id., p. 124.

[102]Id., p. 133.

[103]Id., p. 138.

[104]Id., p. 139.

[105]Id., pp.138-139.

stolen items and hooded sweatshirt were recovered along a route between the Money Mart and petitioner's arrest. In addition, both Beling and Mayo positively identified Cook as the man who committed the robbery at the Money Mart.

A rational trier of fact, after viewing this evidence in the light most favorable to the prosecution, could easily have found that Demond Cook was the perpetrator who robbed Beling at gun point on December 3, 2008. The trial judge was well within his authority to make credibility determinations as to the testimony of the witnesses. It is not for this court, on federal habeas review, to reevaluate the credibility of witness statements or the weight of the evidence or to substitute its own judgment for the trier of fact, whose fact-finding must be given deference. Considering the evidence in the light most favorable to the prosecution, it was rational and reasonable for the trial judge to have found that all essential elements of armed robbery were proven beyond a reasonable doubt. The state courts' denial of relief on this claim was not contrary to or an unreasonable application of Jackson. Cook is not entitled to relief on this claim.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that Cook's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen

43

(14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[106]

New Orleans, Louisiana, this _____2nd_____ day of February, 2017.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[106]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

44